Good morning. May it please the Court. I'm Douglas Leder from the United States Department of Justice and representing the United States as the appellant here. With me today is Assistant United States Attorney Judith Hines. In this case, the district court dismissed a criminal indictment against seven defendants who were charged with providing material support, and by that I mean money and fundraising, for a foreign terrorist organization, the People's Mojahedin Organization of Iran, which I'll refer to by one of its initials, the MEK. The district court dismissed the indictment because it ruled that, as a facial matter, the designation scheme was unconstitutional because it did not protect sufficiently the asserted due process rights of the foreign terrorist organizations. Not surprisingly, the defendants here are not really supporting the district court's rationale. Instead, what they are arguing is that their own due process rights are violated by this scheme because they should be able to argue that they have a First Amendment right to associate with the foreign organization unless the court, in their specific case, has determined that the organization is indeed a terrorist organization. My plan is, I'm happy to answer any of the questions from Your Honors, my plan is primarily to address the arguments made by the defendants because that is the, what their brief covers. The argument being made by the defendants is wrong and is inconsistent with the way that the Supreme Court and other courts have analyzed issues involving the power of the executive over dealings with foreign entities, so that, as I said, here, the defendants' main argument is that regardless of the fact that the Secretary of State has designated the MEK as a foreign terrorist organization, and regardless of the fact that, for instance, in 1997, the 1997 designation, the D.C. Circuit specifically upheld that designation, there has to be an entirely new proceeding at which they can argue that the MEK is actually not a terrorist organization. Now, in a way, this argument is rather ironic because the MEK itself has conceded that it is foreign, which is the first criterion under the Antiterrorism Act of 1996, the statute it issued. The MEK itself has said that it engages in violent activities, assassinations. What the MEK does is infiltrate into Iran and assassinate high-level officials. And, indeed, if you notice the most recent D.C. Circuit opinion upholding the designation of the MEK, which I brought to this Court's attention in a 28-J letter, the Court there, particularly Judge Edwards, in his concurring opinion, points out that the MEK itself trumpets this fact, that what it does is it goes into Iran and assassinates people, and it goes into Iran and kills people. And so the — it's ironic, then, that the defendants here are saying that there should be further proceedings to determine whether the MEK itself is a terrorist organization, a foreign terrorist organization. Well, I understand part of the argument, and that is killing people is not necessarily terrorist activity. That is correct, Your Honor. As the D.C. Circuit has held, going into foreign countries and assassinating high-level officials for political purposes is terrorist activity. Well, no, that's not necessarily true. If that's terrorist activity, this country has in its past engaged in terrorist activity. That may very well be, Your Honor. Obviously, we're looking at a statutory definition provided by Congress. We could have a very interesting, I suppose, debate. Was George Washington a terrorist? Was Robert E. Lee a terrorist? It might be very fascinating, but the issue here is Congress has provided a statutory definition of what is terrorism. And again, I refer you to the D.C. Circuit has analyzed this now several times. The — so we have an organization that it's — that it is absolutely clear is a foreign terrorist. All right. Your counsel is here. I know you're arguing against somewhat of a moving target because the district court did roll rather broadly, and we have some slightly different arguments on appeal. But I'm — is your argument that — it seems to me you have to defend against — you have to defend the statutory scheme as a whole, and you seem to be relying on the fact that in this particular case, M.E.K. has admitted that it's a terrorist organization. Well, what about other cases where there is no such admission and a finding is made by the Secretary of State? Certainly, Your Honor, I'm happy to defend that. Obviously, I was focusing on the facts of this case, but I'm happy to defend the statute more broadly. Well, would you want us to do a very narrow ruling? Really? Are you asking for a very narrow ruling that in this case, where the terrorist organization has admitted — well, where the party — the person who received the resources or funds or the entity that's received has admitted it's a terrorist organization, then the indictment can proceed? Your Honor, what I would like is obviously a very broad ruling from this Court. But what I'm interested in primarily is the reinstatement of the indictment. So if for whatever reason this Court decided to issue a narrow ruling, that would be fine with me. But, no, I would like a broad ruling, and I'll explain why the statute is in its broad sense constitutional as well. Did you argue that point to the district court, that the M.E.K. and submit documents that the M.E.K. was a terrorist organization or admitted to be a terrorist organization? I'm certain, yes, that we pointed out that the M.E.K. has told the D.C. Circuit in its various filings there that it does engage in these activities in Iran, yes. We most definitely argued that in the district court, yes. And, by the way, I'm sorry. I think I may have forgotten right up front. I did want to – I'm hoping to have a couple of minutes at the end for rebuttal. I think I forgot to say that. Your Honor, the – in the broad sense, yes, this scheme is clearly constitutional, and the district court is plainly wrong because, as I mentioned before, we have precedent, particularly from the Supreme Court, that indicates that in the area of dealings with foreign entities, the executive can decide to bar such dealings. So, for instance, in Regan v. Wald, which itself is very helpful to us, and its discussion of a prior Supreme Court case, Zemel v. Rusk, the Supreme Court makes clear there the executive had imposed an embargo on dealings with Cuba. And the Supreme Court makes clear that because the Secretary of State and the President had determined that for foreign policy, national security reasons, that was going to be our policy, there could be no Fifth Amendment right, right to travel. Or in Zemel v. Rusk, it was both a First Amendment and a Fifth Amendment claim that, indeed, they could have dealings with Cuba. And the Supreme Court says, no, we're relying on the determination made by the executive that this is not in the interest of the United States. Let me ask you this. I hope it doesn't sidetrack you too much. The statutory scheme sets up a system whereby the status of this organization, whether it's terrorist or not, is determined in the D.C. Circuit. Do people like the defendants in this case have the right to intervene in that proceeding in the D.C. Circuit? No, they do not, Your Honor. They allege that they have a First Amendment right to make contributions to this organization. We also have a fair amount of law about res judicata and so on that someone cannot be bound by an adjudication of their own rights if they were not party to the prior adjudication. And that particularly turns out to be so when not only they weren't parties, they could not have been parties. The argument here is not simply that they were not parties to this suit, and therefore they couldn't have argued about the legality of the designation as to something that didn't concern them. Their argument is, I have a First Amendment right to do this, and I was not a party, and therefore I should not be bound by an adjudication of my rights in a proceeding to which I was not a party. What's your answer to that? I have a couple of answers, Your Honor. First is the case law itself. There are numerous cases where the, again, as I mentioned, the Supreme Court has indicated those decisions are for the executive to make, the decisions about dealings with foreign entities. No, I'm afraid that's not responsive. A statute sets up that there shall be a judicial determination. And you're saying that because there was a judicial determination that this is a terrorist organization, these people are bound. And I'm asking you, well, how can they be bound by a judicial determination in a proceeding to which they were incapable of becoming parties when it affects their own individual rights? Right. And, Your Honor, I heard the question. I very much am intending to use it. You're on your way to an answer. I am, yes. Okay. And I have about a three-part answer. Okay. And I will get to each part, Your Honor, because I think all three help. But let me jump to the most direct answer. The Boseroff decision from this Court and Mandel and Spohr, there that the inquiry is when there is a determination made, at that time I think it was by the Secretary of Commerce, to place items on a list, an export list, meaning you can't export the item. The — in Boseroff in particular, the Court analyzed the point about could somebody be prosecuted for criminal violation of trying to export that good. Did they have a constitutional right to export that good absent the regulation? No, certainly not. But here they do have a constitutional right to free speech absent the designation. But that's the exact — I'm glad that you said that the way you did because that's the exact flaw in defendants' arguments. They do not have a constitutional right to associate with the MEK. And that's where I was getting to, Your Honor. Well, I find another constitutional right here. Yes. It's not the First Amendment right, but it's a right to a fair trial, a due process Fifth Amendment right that they are not able to dispute an element of the defense. So there is a constitutional right that is being removed by this subsection 8 of the Act. Two answers. Very briefly, address your question, and then I'd like to go back. Take as long as you need for Judge Wardlaw's question, please. Fine. I have more on yours, Judge Fletcher, also. Judge Wardlaw, that's exactly what this Court rejected in Boseroff. This Court said that, no, you can be criminally prosecuted on the basis of a determination made by the executive to place something on the list and that that determination could be final. That's what this Court held in Boseroff. And it said in so holding, it said the Court was relying on its prior decisions, its Mandel and Spohr, explaining why the Supreme Court's decision in Mendoza is distinguishable. And so this Court has already addressed that and answered it. And here's why that's correct. And this gets back, Judge Fletcher, to your question. When the President says we're not going to have trade with Libya, the President makes that determination. Then somebody goes ahead, the Farrakhan case, which is discussed in our brief, and says, I want to send money to Libya, and I want to travel to Libya, and I want to have dealings with Libya, and I have a First Amendment right to do that. And the Court there said, no, the executive can determine that there shall be no dealings with Libya. And so the defendant there does not, if there were a criminal proceeding, doesn't have the right to say, I want judicial review. Well, you know, you just skipped over what I encouraged you not to skip over. This statutory scheme does not give to the President the untrammeled right to designate this organization as a terrorist right. The statutory scheme is that there shall be a judicial determination as to whether or not the statutory criteria are satisfied. And my question is, why doesn't this group of defendants have a right to participate in an adjudicative determination when Congress itself has indicated that there must be a judicial determination? Two answers are, no, Congress did not say anything about must. Congress said if the organization – I'm sorry, Your Honor. Go ahead. Congress said within 30 days of the designation, if the organization wishes to challenge its designation, it may do so. As I'm sure will not surprise Your Honor, of the 37 or so organizations that have been designated, which include, for instance, Al Qaeda, Hamas, Hezbollah, most of them have no interest in challenging the designation. And I'm not sure that's relevant to this case. Would you stick with this case, please? Of course, Your Honor. I thought the scheme was that the Secretary of State makes the determination, not the court. The court can't designate a terrorist organization and it can't undesignate one. All the court can do is assure that the Secretary followed the very limited constraints on him that the statute imposes. Is that correct? That's exactly right. And what I was just about to say, Mr. Fletcher, is indeed this Court has already answered that in the Humanitarian Law Project case, where this Court said the – there's a complaint brought saying the statute violates our First Amendment rights to provide money to, for instance, the Tamil Tigers, the group that controls about a third of Sri Lanka and murders hundreds and thousands of people. And they said we have a right to provide them with material support. And part of their argument was, and that designation scheme is invalid and the judicial review scheme is no good. And this Court said the judicial review of a challenge to the Secretary of State's designation is to be exclusively in the D.C. Circuit. And so this Court said that is not for us to review. And that makes good sense. As this Court said in Bozharov, think how – I think the word this Court used is it would be disastrous if different courts in the United States were making different determinations on something so clearly tied in with foreign affairs and national security. So think about if the D.C. Circuit said the MEK is indeed a terrorist organization and the Secretary of State has developed a massive record which has been tested in this Court, and the MEK is a terrorist organization. We uphold what the Secretary of State did. If the defendants are right, every time throughout the United States we prosecute somebody for providing material support to the MEK, each district court around the United States could say I agree or I disagree, and we would have different district courts, even though the D.C. Circuit in a case validly brought under the statute within 30 days of the designation directly in that court itself, we would have a district court saying I don't think that evidence was enough. So help me on a problem I'm having. I'm about two-thirds of the way through your argument being with you, and there's one point where I have a little difficulty. I'm thinking of an analogy to the statute, I think it's 18 U.S.C. 922, that prohibits sale of a firearm to a convicted felon. The person who's charged with selling a gun to a felon cannot put at issue the correctness or the constitutionality or even the jurisdiction of the court that convicted the buyer of the felony, even if it's a totally invalid conviction, void for lack of jurisdiction. He probably can't challenge it. All that he can put at issue is whether he sold the gun to the person and had the requisite see enter. I'm with you there, and I can see where that's analogous to this case. The point where I have a question is no matter what sort of barbarity you have abroad, there are always some supporters of that barbarity in the United States, and to some extent they have First Amendment rights to support barbarity. It is not so clear where the First Amendment rights end, and I'd like you to throw some light on that. Definitely, Your Honor. The First Amendment rights end when, as I indicated before, the political branches have made a decision that there shall not be dealings with a foreign entity. Well, the political branches can't tell an American not to write newspaper editorials in support of al Qaeda. That's exactly right, Your Honor. And so they can't say, first, that Americans – I was going to say American citizens, but it's broader than that. It's people in the United States obviously can say whatever they want, however they want. To some extent, you talk with your checkbook in politics. Correct. The – what Congress did, and in passing this statute, Congress itself was very cognizant of the very issue you're raising, Your Honor. Congress said it is not – we're not making it a crime to speak in support of an organization. And we have said it's not a crime to be a member of the organization. The statute, remember, says you can't provide material support, and then it defines material support. This Court in the Humanitarian Law Project – That's why I mentioned that sometimes you talk with your checkbook in politics. Yes. And I believe the Supreme Court said so in Buckley v. Vallejo. It did, Your Honor. What we have said, the reason that Buckley v. Vallejo is distinguishable, and this Court – I stood here I think about two years ago arguing the Humanitarian  I said the difference is Buckley v. Vallejo involves domestic situation providing money to a domestic political organization. It's a completely different constitutional inquiry when we're dealing with a foreign entity. And that's where – But what's the right framework for analysis? Do we say, okay, there is this First Amendment right, but what tests do we apply? Do we do a strict scrutiny? Do we do a balancing? Do we do – I mean, you can't just – if there is this right, you can't just say you have a right and the government can just wipe it away. Your Honor, what the Supreme Court has answered that question in a couple of key cases. One is Clyndon v. Mandel, where there were citizens of the United States who alleged a First Amendment right to associate with an alien who wanted to come to the United a bona fide, facially legitimate reason why they're not allowing Professor Mandel in here. That is sufficient. So that's one test the Supreme Court has said. Another is – and I refer again back to Regan v. Wald. The Supreme Court there said the Secretary of State has made the determination that dealings with Cuba is not in the interest, the foreign policy and national security interest of the United States. And the Supreme Court accepted that all by itself. So the Court has either said that this is left to – is a determination to be made by the political branches, or at a minimum it has said as long as the government provides a facially legitimate bona fide reason. And, Your Honor, both of these are discussed in our opening brief. So – So basically, support for a political candidate, you may have a First Amendment right to talk with your checkbook to some extent. But if it's for Hitler or Stalin or Saddam Hussein or al-Qaeda or Hezbollah or any of these, you don't have a constitutional right to talk with your checkbook. So the executive can't act on it. That's exactly right, Your Honor. And I'd want to make clear, even domestically, it's probably even more than speak with your checkbook. Notice cases like Healy and NAACP, the – versus Claiborne Hardware. The Supreme Court has made clear that in a domestic context – Well, you always have a right to speak. And, in fact, all of those villains that I just recited had many avid supporters in the United States. And they could – there would be nothing wrong with these defendants standing on a street corner saying, the MEK, to the extent that it assassinates Iranian officials, that's a good thing, and they can do that. Again, this Court in the Humanitarian Law Project case said you don't have any right to support foreign terrorism. And we would say it's even broader than that, for the reason I was saying before, the Regan v. Wald line of cases, Zemel v. Russ, Kleinitz v. Mandel, you – the Congress and the President can cut off the right to have dealings with foreign entities, and that is up to the President to decide. Another example, for example, is the D.C. Circuit case, Palestine Information Office v. Schultz. There, the PLO had an office in the United States, and the Secretary of State ordered it to shut down. The head of that office was a U.S. citizen, and he said, I have a First Amendment right to speak and argue that the PLO's cause. In the D.C. Circuit, Judge Mikva said, you have a right as an individual U.S. citizen to say whatever you want. You don't have a right, though, to operate as, in essence, the ambassador of the PLO. That, the political branches can't stop. The defendants heavily rely on – Counsel, we – you ran through all your time. Thank you, Your Honor. Because of the significance of the case, we'll give you a minute or two for rebuttal anyway. Thank you very much. Counsel. Good morning, Your Honors. I'm Stephen Bergeon, and I'm counsel for Royer-Romani. I'm here today representing Royer-Romani, one of the defendants in this case and one of the appellees, but I'm going to present oral argument on behalf of all the indicted defendants. Help me on this problem that I raised with your adversary. It struck me that a lot of the due process issues really ought to drop by the way because of that analogy that occurred to me with selling a gun to a felon. The person who sells the gun to the felon does not have a due process right to challenge the felony conviction of his buyer. All he has a due process right to challenge is the government's accusation that he sold the gun to the person, that the person was convicted of a felony, that he knew he was convicted of a felony. Your Honor, there are actually three answers to that as to why that is not analogous to this situation and why, in fact, what you posit may not even be correct on its own terms. Go ahead and help me on it. Okay. It's true that the Lewis case, the Supreme Court did hold that the convicted felon himself cannot challenge the first conviction, and the Court pointed out that he had an opportunity in the first proceeding to challenge that conviction. He may well have chosen not to do that. He may have waived it. He may have put on a lousy defense. Whatever the case, he has no right to come back again. But it pointed out quite clearly that he had had the opportunity. That's first. Secondly, it is true that here there is a statute, Your Honor, that says that the seller cannot challenge the conviction. But to my knowledge, no court has ever held that satisfies due process. Three, this case involves a First Amendment claim. And all of the cases cited by counsel, with the single exception of Clindy's, which I want to discuss, do not involve a First Amendment issue, and in particular a First Amendment right to provide expressive support, as the Supreme Court has defined that, to a nongovernmental foreign organization or a nonrepresentative or a nonagent of a foreign governmental organization. But before I get to any of that, and before I correct counsel on a number of misstatements, including, surprisingly to me, what I feel is a misrepresentation, which I will get to, of Judge Nelson's opinion, in U.S. v. Bazaroff, I feel I have an obligation to my clients to spend about three or four minutes discussing the statutory argument in this case. Because if Your Honors decide the statutory decision in this case, the seven indictments here will be dismissed, the decision below will be affirmed, and the decision will have no effect beyond the seven defendants in this case, and will leave this statute intact perhaps for another day for somebody else to make what I believe are very important and even profound First Amendment issues. So let me please just address briefly the statutory argument, because I think, as you'll see when we go through it, we're really quite correct on this. The statutory argument is really a classic quid pro quo argument, and it goes something like this. In enacting Section 2339b, which is a very strict liability criminal statute, almost an unheard of criminal statute here. I have trouble with that characterization. I read the statute, and it doesn't look like strict liability. It says that a person can't contribute material support or resources to a foreign terrorist organization knowingly, and it seems like the word knowingly prevents it from being a strict liability statute. The government has informed this Court in the Unitarian Law Project argument that if a group has been published in the Federal Register as a foreign terrorist organization, the only defense someone who gives $1.00 to that group can raise is that the group is either not, is either, is either not on the list. And the government said this in an argument? To this Court. The government's position is I just. I thought we got to decide what the statute meant. You're saying the government gets to impose its definition of knowingly? The government's, well, I'll put it this way. As we understand the government's construction, at least, of knowingly, it has been construed to mean that all the defendant has to do is to knowingly intend to give money to the group. The defendant doesn't. So they say. So they say. Is there a case saying that? No, there is not. No, there is not. But even if the defendant knows that this has been published in the Federal Register and so learns about it and so gives money, the defendant is still a strict liability statute because the defendant cannot challenge whether or not the group is, in fact, a foreign terrorist organization. And let me explain why I think this is really what the quid is here before I get to the quote. What does it matter? Why couldn't Congress pass a law that said no American can knowingly provide material support or resources to a foreign charity that provides powdered milk for children? The dairy industry wants only whole milk. So they say no powdered milk for children. Wouldn't it be a crime, then, to contribute money to an organization that provides powdered milk for children? I mean. Well, that gets into the issue that was raised by the Supreme Court in Roberts v. Jaycees, which is the discussion of when giving money to a group that is arguably not engaged in any kind of political activity, social activity, or cultural activity is protected, is protected speech or protected expression. The Supreme Court, if I recall in Roberts, called it the freedom of associational expression. Let's take a slightly different example, Judge Kleinfeld. Let's take a group like Planned Parenthood overseas. And let's just say. Why don't we try my example? So your example would depend on whether this group was engaged in any kind of social, cultural, or political activity. If it is, it's constitutionally protected. Why can't we just take my example? If Congress can arbitrarily say no material support to such a type of organization without regard to whether it's a terrorist organization or not. If the organization is engaged in political speech and is not an entity of the foreign government, the First Amendment does not permit Congress to do that and there is no case to that effect. What authority do you have for that? Well, I'll give you several cases. For example, if you look to. I'm thinking that you have a real problem with Humanitarian Law Project v. Reno. It seems to say that there is no constitutional right or, quote, there is no, quote, constitution. No, I'm sorry. There is no, quote, right to provide resources with which terrorists can buy weapons and explosives. That's absolutely right, Your Honor. There is absolutely no right whatsoever to give money to a terrorist organization. But there is a right to give money to a non-terrorist organization and there is a right to defend your contribution, if you will, in a criminal prosecution by showing that, in fact, the government was wrong and this is not a criminal, this is not a terrorist organization. Okay. I think we're finally getting somewhere. So we start out from the proposition that if this is a terrorist organization, there is no First Amendment right to contribute money to that organization. That is exactly the case with regard to the obscenity in the committee. The question then is who has to make that determination and is it permissible for the government to set up a scheme under which the D.C. Circuit will make that determination as to a particular organization and that determination is then binding on all subsequent prosecutions under the statute. Let's imagine a different statute, for example, a McCain-Feingold bill that's adjudicated in the United States Supreme Court as to various things. Once the Supreme Court has adjudicated that this is protected speech or not protected speech, permitted contribution, not permitted contribution, is a plaintiff, excuse me, as a criminal defendant later prosecuted for violating some provision of McCain-Feingold that had been upheld by the Supreme Court entitled to make an argument that that statute at that part of the statute is unconstitutional? No, because first of all, the statute would be, that decision would be stare decisis in any future case. And so McCain-Feingold. And why has that not been the answer in this case if the D.C. Circuit has so held? Because the decision is a very different decision. The decision in this case is a decision that a group, is a terrorist organization no different than the magazine in McKinney, was determined by an Alabama court to be obscene, to be pornographic. It could have been the worst thing in the world. It had no First Amendment protections. The government then prosecuted a bookseller, something like 12 days later, for selling that magazine. And the Supreme Court judge Rehnquist wrote the opinion held that the bookseller has a right of his own to show that the magazine is protected, because if it is protected, then that's protected expression and he can't be prosecuted for selling it. So here. But in the McCain-Feingold situation, what the Court is ruling is on something else. It's ruling as to whether the government has a compelling interest or a sufficient interest, whatever they decide based on yesterday's argument, to have some categorical across-the-board limitations on certain expressive activity. And that would be a categorical decision. What I'm interested in, though, is at what point is something settled so that it can no longer be raised in a criminal prosecution? And the government's argument is that there is a statutory scheme set up by which it can be settled, will be settled by the D.C. Circuit with the possibility of review in the United States Supreme Court. And once that is settled under this statutory scheme, of course, no such statutory scheme in McKinney. Right. And no such sort of foreign policy. I mean, there are lots of differences. Once it's settled, that's the end of it. Your Honor, I have to disagree with you about the statutory scheme in McKinney. There was such a statutory scheme. It was a very parallel statutory scheme. And the Supreme Court said that it was inadequate. But let me raise another point here that relates to this that I was going to bring up later, but I'll bring up now. It's not true that the government said that the only place Congress placed review is in the D.C. Circuit. Congress also, in the same section, 2339bc, provided that if the government wants to obtain an injunction to prevent clients like ours from engaging in material support, Congress can go into any United States district court, can obtain an injunction What section is that? 2339b, small c in parentheses. But there's more. It can go into any district court, can obtain an injunction. It then sets up a whole procedure for using classified information, for having expedited appeals to this Court, the Ninth Circuit, if you're in the – if you're within the jurisdiction of the Ninth Circuit, for an expedited appeal interlocutory on the classified information. It then provides, ultimately, for appeals on the ultimate decision. But most importantly, Your Honor, in Section 1189a8 of Title VIII, which is the – which is what we are challenging the constitutionality of here, use of the designation in a trial or hearing, this is what the Court said – I mean, that Congress said. If a designation under this subsection has become effective under paragraph 1b, that's A defendant in a criminal action shall not be permitted to raise any question concerning the validity of the issuance of such designation as a defense or an objection at any trial or hearing. In other words, what they provided is that if the government brings a civil action to get an injunction to prevent anyone engaged in doing the activities here in the future, or if they hear it's going on, they can try and get a CRO or a preliminary injunction and just stop it in its tracks, and then that will be punishable by contempt in jail and the like. The defendant was given a right by Congress to challenge the designation. Now, the defendant wasn't given that right if it's a criminal proceeding. You might ask why, and I've thought about that, and the answer, I think, is because Congress was perhaps concerned about juries in this issue, because if the defendant raises it in a criminal proceeding, it becomes a jury issue. But it's not entirely clear to me. There was a dispute in McKinney. There are a lot of possibilities. Congress might have thought the civil proceeding might be prospective and some more flexibility might be appropriate, but criminal is when they've already given the material support. Criminal, if anything, you should be entitled if you're defending your life and 15 years in jail for giving $1 to an organization on the list, and I should point out that back with the predecessor list, before the strict liability took place, the African National Congress was on the list. So when Nelson Mandela, if this statute had been in effect, came to Yankee Stadium or to Los Angeles and fundraisers were held at Yankee Stadium, they passed the hat. Arguably, anybody who gave a contribution to Nelson Mandela could have been put in jail for 15 years. Well, let me use another example, and this may seem grotesque, but what you're deciding today is going to have far-reaching effect. Back in the 60s, my recollection is that SNCC and CORE and Dr. King's group were all accused by southern states and southern governments of being communist infiltrated, being subversive, working for the Soviet Union. We heard all of that. And if for any reason some administration had put on a list as a domestic counterpart, as a communist front organization. I think it's pretty hypothetical. No, I think we have to. There was an attorney general's list in those days. No, there wasn't. And those organizations were not on it. There was. No, but the African National Congress was. And if students had given money to the African National Congress. It was taken off the list in 1991, after Nelson Mandela came to this country. And there were many student movements and many students we all know participated in anti-apartheid activity. And the ANC was engaged in activity that may not have been a threat to the economic security of the United States, but did meet the test in this statute, which is really, really broad. This is what it is. You have to be a foreign organization. You have to either use or threaten, threaten alone, to use a weapon. And the weapon can be a knife. I think you're saying now that because the executive branch might misuse the power in this statute, that it's constitutionally prohibited from possessing that power. It is. But I don't think that follows. There is no power that can't be misused by an unwise executive branch. There is a constant. The check on unwise power is not to preclude a material support statute. We are not arguing humanitarian law project. There can be an absolutely strict liability material support statute like this. What it cannot do is prevent a defendant from challenging the essence of the HLP decision, the humanitarian law project decision. Judge Kaczynski said there is no right to give to a terrorist organization. There is a right to contribute to a non-terrorist organization. Let me ask you this, if I may. Is there some reason to think that in the proceeding in front of the District of Columbia Circuit, that the MEK was doing a bad job in making the argument that it was not a terrorist organization? There are several facets to the MEK's position, because it's not just the D.C. Circuit, Your Honor. It's also the argument it makes administratively first to the Secretary of State. Now, in this case, my understanding is that the MEK did a bad job in the D.C. Circuit. I think the MEK was hamstrung by the district of the D.C. Circuit's parameters. This is what I mean by that. They did not admit, contrary to counsel, that they were a terrorist organization within the meaning of the act. My understanding is what they did admit is they had used weapons for other than personal monetary gain. They are a foreign organization, and they did, you know, either kill people or injure people or commit substantial damage to property. So they met those parts of the test. Their argument was that they are not a threat to the national security of the United States, and under this statute, the national security of the United States is not like the escort cases. It's not defined, limited to what we would think, the national defense, or even our foreign policy. It includes, and it says this specifically in the law, the any – it says economic interests of the United States. So it's a mere fact. That's the problem. Would your clients have done a better job in the District of Columbia in arguing whether or not the MEK was a terrorist organization? I think our clients would have done several things differently. First, I think that when the second District of Columbia D.C. Circuit decision came out, they would have more effectively done the job that would have – that is the base of our statutory argument, which is they would have – they would have been able to argue more forcefully that the designation shall be set aside, which is what the law says. Your Honor, it's not discretionary. It says shall be set aside. They would have argued in the second when the procedures were unconstitutional and were determined by the D.C. Circuit to be unconstitutional in the second case that they should be set aside. The D.C. Circuit was concerned in the second case, not in the third case, but in the second case, when they actually held the procedures unconstitutional, with the fact that the bank accounts were frozen and members could come into the country. We don't have any quarrel with that. And it probably made good sense to keep it in place through that. But if it didn't. Now, your adversary – your adversary said that your clients or people like your clients could not have intervened in the D.C. Circuit proceeding. Is that right? That's correct. But they are precluded. The only entity that can participate is the – is the foreign terrorist organization if they have a domestic presence. So if they don't have a domestic counterpart, because in PMOI-1, they were held – they were not able to raise the challenge. There was no standing. So I'm concerned with the consequences of finding that there could be multiple district court decisions at odds with each other or circuit court, ultimately, decisions at odds with each other so that we could end up with a situation where providing funds to a particular organization is a crime in one part of our country and not in another part of our country. You know, I suppose you'll say ultimately the Supreme Court would have to review that, but in the meantime, it would seem that there's some logic and fairness that compels that a one decision-maker make that determination. That may be true, Your Honor, but although, if I could digress just a second, as I point out, they did provide for civil actions in the – by the government in different districts, but there is a solution to that. But as you also point out, there is a big difference between civil and non-civil. I agree. But there is a solution to Your Honor's problem, and it lies with Congress, and that's this. There was a debate in the McKinney case, which is the essence of our First Amendment argument, between Justice Rehnquist and Justice Brennan. And Justice Rehnquist had the votes. And what Justice Rehnquist held in the opinion is the criminal defendant just has to be given some meaningful opportunity to participate in an obscenity determination. He did not say it had to be in the criminal proceeding. He didn't even say it had to be in the court that the criminal proceeding was going to be in. Justice Brennan suggested that perhaps it would have to be in the criminal proceeding, or if not, the civil proceeding might have to adopt certain criminal standards. But that – but the essence of that debate and of Justice Rehnquist prevailing in that case, although the Court didn't ultimately have to finally determine the question, is Congress might well be able, if this Court overturns this provision on constitutional grounds, Congress on First Amendment grounds, Congress could go back, redesign a scheme, provide a method of review that people who want to provide material support could somehow participate in or go to. I suppose they could require people to go to the D.C. Circuit if need be. We just reviewed the statute that's there. We can't tell them to pass another one. And I can't see the strength of your analogy at all. The point of the community standards doctrine is that it may be perfectly okay to sell some sexual material in San Francisco that you're not allowed to sell in Alabama because there's recognition by the Supreme Court of permissible interest in national diversity there. But I can't see how it could be perfectly okay for Californians to contribute money to Al-Qaeda, but not Virginians to contribute money to Al-Qaeda. I think that's true, Your Honor. But I think also that that had nothing to do – if you go back and you look at Justice Rehnquist's opinion, and I've read it three or four times in preparation for this argument, there is not one mention in his opinion other than the first line where it said plaintiffs were setting forth the standard for obscenity. But there is no tie in that opinion, in that analysis, to contemporary community standards. They didn't just assume it. No, because the reason is that 12 days before, in the same State of Alabama, the government went in against the bookseller, the magazine publisher, and they got a court order that it was obscene. I wouldn't be surprised if it was obscene. So, Phil, the point there is the gravamen is whether it's obscene. The point here is – the gravamen here is that it's designated. It doesn't really matter if the State Department is wrong. What matters is the State Department has this power of designation. And it doesn't really matter, from the point of view of whether the contributor has committed the crime, whether the organization really is terrorist. What matters is whether he knowingly contributed to an organization on the list. Well, you see, now – I think we've now gotten to our basic disagreement. We profoundly disagree on that, because if the organization – let's say they put the Democratic Party on the list or the Republican Party on the list, on your analysis – I would think that that party would have a very good appeal. Yes. But on your analysis, if for some reason they didn't, it would be perfectly constitutional to convict of a crime and send to jail someone who gave that contribution. And if they wanted to argue they had a constitutional right to contribute to a political organization, even if the Supreme Court had held in Buckley they do, they would have no ability to do it if the President invoked national security. Now, that's a ridiculous, far-fetched hypothetical. I grant you. But a lot of what we look back on now as what was done in the 40s and the 50s and the 60s, we would say those are ridiculous, far-fetched hypotheticals. We do disagree on that. Ultimately, the reason obscenity is different, is not different, is because if it's obscene, it's not within the First Amendment. And if the book is not obscene, it is. And if this is a terrorist organization, as Judge Kaczynski said, it is not within the First Amendment. But if it turns out it's not, then it is. And I have no doubt that al-Qaida and Hamas and 99 percent of the organizations they put on are going to be terrorist organizations. And I also suspect they're going to be. Alito, in the European Union, read what they say. Hamas is a charitable organization. Well, apparently they changed this week. But in any event, I would say that there isn't a jury in the world, if it went to a jury or if the government set up a civil proceeding, a judge in the world who would find any of those organizations not to be threats to the national security of the United States. That's not what this case is about. This case is about a First Amendment right. And let me tell you what Judge Nelson said about this, because this is really important, because the other side is saying that the Standing Foreign Goods Out-of-the-Country cases are on point and there's no right. This is the Ninth Circuit, Judge Nelson. In the United States v. Bazaroff. Ginsburg. Which Nelson? Garthi-Nelson. And she said on a panel with Judge Schnee and Judge — District Judge Wanger. And she — and this was after all the other export cases. This is the latest export case. She says this. We note, colorable constitutional claims, this is a quote, colorable constitutional claims may be reviewed by the courts, even when a statute otherwise precludes judicial review. And she then goes on to go deal with a hypothetical. And she says, supposing the government were to discriminate against minority groups in who can send exports out and who can't, that would be reviewable. And I suppose that if the United States were to say that no Jews could work in certain agencies or no Hispanics, I suppose that would be reviewable, even if the government invoked national security. National security is not a be-all and an end-all. There are certain rights in the Bill of Rights. Now, let me just talk briefly about a couple of cases, because I want to explain that the cases are not as they were described on the First Amendment issue. First, the export cases. I'm going to cancel your way over your time, but you can be assured that we will study them critically and not just accept the representations made. Okay. I do want to say, though, they are not First Amendment cases. The only First Amendment case is the – is of those cases. Besides Clyde East, which dealt with the power of the government to exclude aliens from coming into the country, the plenary power of the executive branch, the only other cases are the cases dealing with foreign governments, not other foreign organizations. And I would urge the Court to look to Judge Larry Silberman's concurrence in the P.I. Houghton Information Office case, because in that concurrence, he, one, talked about the fact that we are a nation of immigrants, our people are really interested in what goes on overseas and supporting foreign clauses, two, that when the government invokes national security to deal with an organization like the PIO, there should be searching and precise judicial review, and three, he says that what was critical to him in shutting down that operation was that there was no criminal sanction and it was not a criminal prosecution.  Thank you, counsel. Be very brief, Your Honors. And before I sit down, I do want to make sure to note for you, there's an error in our reply brief and I just want to tell you about it. In response to my brother counsel's arguments, the – some of the cases I cited are First Amendment cases. Farrakhan, for example, I believe the Demel v. Rusk also involves First Amendment. However, my brother counsel says you should draw a distinction between cases involving foreign governments and foreign entities. But then the very case he cited shows that that's wrong. The Palestine Information Office Act case, the D.C. Circuit upheld the ability of the executive branch to cut off dealings with the PLO. The PLO is not a government at that time. It had no control over territory, et cetera. And the argument is clearly wrong because, for example, the United States never recognized the Taliban as a – as the government of Afghanistan. We believed that the Taliban certainly controlled territory, et cetera, but we did not recognize it as a government, and so under my brother counsel's argument, we could cut off dealings with, say, Libya, but not with the Taliban because the Taliban is not a government and that that can't be right. Okay. Before your rebuttal time runs out, could you please respond to the argument based on McKinney? In your view, how is this case different from McKinney? Your Honor, I will respond. I have to admit I think that Your Honors gave the best answers already. I'm not sure I'm satisfied with my own answer, so you'd better come up with a better one. Okay. I'll try. The one was community standards, and if you – as I think my – But they're still within the same community, right? No. It was the same State. I don't believe that that's the same community at all. Okay. As I recall, the decision was – the initial decision – I might have the cities mixed up. I believe one of them was in Birmingham and the other was in Montgomery. I see. Okay. So in your view, that's a difference even though within the same State. Okay. That's right. That's one. And, Your Honor, I assume that – I know Your Honor is from California. There would be a different community standard in Humboldt than there is in San Diego. Second is the – and by the way, the community standard is mentioned in the majority opinion at the beginning, and I think it's in the concurring opinion, as I recall. Second is foreign relations, that we are clearly in a different universe when we're dealing with foreign affairs and foreign relations, and that is most aptly stated in Regan v. Wald. If I can just – Are you saying that the First Amendment doesn't apply in foreign affairs? You can't be saying that. No. I'm not saying that, Your Honor. That's – Here's the passage in McKinney that troubles me. Yes. This is now the Chief Justice writing to the Court, but it does not follow – Could you give me a moment to pull the opinion out so I can follow it? Of course. Yes. Oh, yes. Absolutely. I don't want to ambush you at all. I'm sorry, Your Honor. Okay. I'm beginning at the very bottom of page 11 – well, let's see. It's one of these darn things. I'm on page – in the U.S. Report Pagination 675. The paragraph that begins – third paragraph on that page, the paragraph that begins our difficulty with this argument. Tell me when you're with me. Yes, I am with you, Your Honor. Is its assumption that the named party's interests are sufficiently identical to those of Petitioner that they will adequately protect his First Amendment rights. There's no indication that they are in privity with him, as that term is, da-da-da-da-da. And now I'm skipping to the next paragraph. But it does not follow that a decision reached in such proceedings should conclusively determine the First Amendment rights of others. Non-parties like Petitioner may assess quite differently the strength of their constitutional claims and may, of course, have very different views regarding the desirability of disseminating particular materials. We think they must be given the opportunity to make these assessments themselves as well as the chance to litigate the issues if they so choose. That strikes me as a sort of a classic day-in-court argument designed to protect the First Amendment right of the Petitioner in this case. And the Court says, well, you know, that may have been litigated in another forum in which that person did not participate. And how can you bind someone on a First Amendment adjudication to the result of a proceeding in which he was not a party and, indeed, in our case, could not be a party? That's the question. And how do you get out from under that? Your Honor, a broad answer and a specific answer. The broad answer is what I said before. The foreign affairs context matters very much. So, for instance, Farrakhan. Mr. Farrakhan wanted to provide money and any kind of First Amendment right to provide money to Libya. Clearly, if Mr. Farrakhan wanted to provide money to the State of California, he would have a First Amendment right to do that, and the executive couldn't interfere with that. But we believe that the President and the political branches can say, you shall not provide money to Libya. Oh, you know, you're sliding over into the argument you kept sliding over into before. We take it as a given that if this is a terrorist organization, that these defendants may be criminally prohibited from contributing to that organization. We take that as a given. The question is, is this organization in fact a terrorist organization? Who gets to determine it and in what proceedings? And are these defendants to be bound by a determination by the District of Columbia Court of Appeals in a proceeding where they could not take part? Your Honor, here's why I don't think I'm sliding over. It's Regan v. Wald. And, by the way, remember, I do have a specific answer. I'm going to come back to it. Okay. Regan v. Wald at the key language is at page 243 of the U.S. reports. It's 468 U.S. at 243 of the Supreme Court's opinion. And I'll quote very briefly. In the opinion of the State Department, Cuba, with the political, economic and military backing of the Soviet Union, has provided widespread support, da, da, da, da. The Court then says, given the traditional deference to the executive judgment in this vast external realm, we think there is an adequate basis under the Due Process Laws to sustain the President's decision to curtail aid to Cuba. So, Your Honor, what I'm arguing is, if the position that the defendants have said is right, when the President declares an embargo on trade with Cuba, they would have a they would say, we have a right to a trial about whether we wish to. Oh, you know, we're still talking about cross-purposes. The statute sets up a proceeding by which the propriety of the designation can be tested. Now, the available points of dispute are restricted. But there is a test to be made as to whether or not this organization is a terrorist organization. You keep assuming that it is or is not. I'm talking about the procedures by which it is made and the proceeding and whether or not a decision by one tribunal combines someone who is not a party and could not have been a party to that proceeding in that tribunal. Your Honor, please don't misunderstand. I understand your question. Well, then I'd like an answer, because you're sliding off of it, at least in my view. Again, I have two answers. But this is very important, so I'd like to address it. I'm not sliding off. I am saying it doesn't matter for constitutional purposes, for the analysis that Justice Rehnquist was giving in McKinney, it doesn't matter whether or not Congress provides limited judicial review in the D.C. Circuit or not. The point is the argument being made by defendants is wrong. They don't have a constitutional right to associate with the M.E.K., regardless of whether it is terrorist or not, as long as the Secretary of State has determined that there shall not be dealings with the M.E.K. And that's what I'm citing you, Regan v. Wall, for. I agree with you 100 percent. Congress has provided limited judicial review, but note the D.C. Circuit said the courts cannot look at the factor of whether the dealings with the M.E.K. undermines national security or not. And that is the only point, the only point that the M.E.K. argued and the only point the defendants want to argue. They want to say these are actually good terrorists. We're helping the United States. And the D.C. Circuit said that's not judicially reviewable. So I don't think I'm sliding off. I'm giving you a broad answer. The specific answer, Your Honor, is that they say, first of all, about not being in privity. Well, here, they very much are in privity. Remember, the — what the indictment alleges — Well, they're not in privity in the meaning in which Justice Rehnquist was using the term. He was using the term in the sense of res judicata. And I do not think they are in privity in that sense. Okay. What I was going to point out is, remember here, the indictment alleges that they — the defendants had discussions with M.E.K. leaders about how to get around the acts. The other point, it seems to me, is that the key is the arguments that — and I think this was shown by the responses to, I believe it was your questions a moment ago. The arguments that my opposing counsel says the defendants want to make are the identical arguments that were made to the D.C. Circuit. I handled that case, and so I'm very — I've handled all three. I'm very familiar. The identical arguments were made. But as I say, I come back to — I believe that this Court is familiar with the Supreme Court decisions have to be read with regard to what was the issue before them. And the issue before them was the — We're way over time. The one thing, Your Honor, if I could just say, we made an error in our brief, and I'd like to correct that. On page 25 of our reply brief, in our editing process, you said Bozeroff did something like provided for no judicial review under that statute or scheme. That I regret. That is incorrect. As the reading of the case shows, this Court held that under certain circumstances there is review under some circumstances, not others, and I apologize for that error. Thank you, counsel. Thank you, Your Honor. The United States v. Rahmani is submitted. We are adjourned until 9.30 tomorrow.
judges: Kleinfeld, Wardlaw, W Fletcher